# United States Court of Appeals
## For the First Circuit

No. 03-2625

THE HOME INSURANCE COMPANY,

Plaintiff, Appellant,

v.

PAN AMERICAN GRAIN MANUFACTURING CO., INC.
and ZORRA TRANSPORT, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Fusté,[*] District Judge.

William A. Graffam, with whom Jorge F. Blasini and Jiménez,
Graffam & Lausell, were on brief, for appellant.
    Derek A. Walker, with whom Heather J. Valliant and Chaffe,
McCall, Phillips, Toler & Sarpy, L.L.P., were on brief, for
appellees.

February 4, 2005

_____
[*] Of the District of Puerto Rico, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This appeal is a sequel to events that have already been litigated before this court.  See Pan Am. Grain Mfg. Co., Inc. v. P.R. Ports Auth., 295 F.3d 108 (1st Cir. 2002).  In that case we ruled that the loss of the integrated tug and barge ZORRA ("ITB ZORRA") came about because of the negligence of its crew in straying from the charted navigation channel, and not -- as claimed by the ITB ZORRA's owner, the Pan American Grain Company ("Pan American") -- because of underwater obstructions in the docking area.[1]

The starting point to the present appeal, however, is the issuance of a marine hull insurance policy ("the policy") by plaintiff-appellant the Home Insurance Company ("Home") to Pan American that provided coverage up to $6,500,000 in the event the ITB ZORRA was lost as a result of any of a variety of casualties. Pan American filed a claim on this policy for losses sustained when the ITB ZORRA caught fire on April 24, 1995.  Home denied the claim, alleging that the casualty was the result of the vessel's unseaworthiness,[2] a condition which is excepted under the terms of

---

[1]  The ITB ZORRA's propellers hit the embankment, and during attempts to extricate it, a fire broke out in the engine room, resulting in the loss of the vessel.  See Pan Am. Grain, 295 F.3d at 113.

[2]  A vessel is unseaworthy if it is not fit and "is unable to withstand the perils of an ordinary voyage." Black's Law Dictionary 1539 (6th ed. 1990).  This includes a vessel that is not manned by a competent crew.  Id.; see also Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 517 (1971) (listing "unfit crew" as one form of unseaworthiness).

the policy.  Thereafter, Home filed suit seeking a declaratory judgment of non-coverage, to which Pan American responded with a counterclaim seeking recovery under the policy for the full amount of $6,500,000, in addition to various other damages.  The Home Ins. Co. v. Pan Am. Grain Mfg. Co., Inc., No 95-1794 (D. P.R. Aug. 21, 1995) ("Answer and Counter-Claim").  Three years of litigation followed, at the end of which Home and Pan American entered into a settlement agreement, The Home Ins. Co. v. Pan Am. Grain Mfg. Co., Inc., No 95-1794 (D. P.R. Apr. 30, 1998) ("H/P Settlement Agreement"), the interpretation of which is the central issue of this appeal.[3]

Pursuant to the terms of the H/P Settlement Agreement, Home paid Pan American $3,333,000 in exchange for which Pan American agreed that Home would receive one third of any future recovery from third parties by Pan American until Home had recovered $1,333,000, and one third of all additional Pan American recoveries over a total of $10,000,000 until Home recouped its full $3,333,000.  H/P Settlement Agreement at para. 6.  At that time, Pan American was immersed in several attempts to recover damages for this casualty, including an arbitration proceeding in New York, five additional lawsuits in the U.S. District Court for Puerto Rico

---

[3]   The pertinent parts of the H/P Settlement Agreement are reproduced as Appendix I of this opinion.

against various private parties, and an action against the U.S. Coast Guard in Miami.

The H/P Settlement Agreement further provided that until such time as Home recouped an initial sum of $1,333,000, Pan American was required to notify Home of any proposed third party settlement of ITB ZORRA claims, and to receive Home's written approval before effectuating any such settlement. Id. at para. 7. However, once the first $1,333,000 were recovered by Home, although Home was entitled to share in additional settlements over $10,000,000, up to the $3,333,000 total paid to Pan American, prior notice to Home and its approval were not required.

One further provision of the H/P Settlement Agreement is of relevance; indeed, it is at the crux of the present dispute: Although Home was to share in all recoveries of third party ITB ZORRA claims up to the total paid by Home to Pan American, Home was not entitled to share in any "verdict or award in favor of Pan American that specifically and separately award(s) Pan American a recovery for punitive damages and/or loss of use." Id. at para. 6 (emphasis supplied).

Approximately one year after the parties entered into the H/P Settlement Agreement, Home learned that Pan American had settled one of its outstanding ITB ZORRA suits, with Ochoa Fertilizer, Inc., for $800,000 ("the Ochoa settlement"). Pan American gave no prior notice of this settlement to Home, nor did

-4-

Home give approval for Pan American to enter into the Ochoa settlement. Pan American claimed that the Ochoa settlement was for damages for "loss of use" of the ITB ZORRA, and thus specifically excluded from the H/P Settlement Agreement. Home, however, was not so easily put off. It contended that, irrespective of the label given to the amounts recovered under the Ochoa agreement, these sums could not constitute a recovery for "loss of use" of the ITB ZORRA, since under maritime law a shipowner is barred from recovering for loss of use where the insured vessel was a total loss, as was the case of the ITB ZORRA. See 2 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 14-6, at 118-119 (4th ed. 2004) ("Only in a partial loss situation is there liability for [loss of use] damages."). Home further alleged that the Ochoa settlement was not the result of a "verdict or award," and thus was also not excluded from coverage of the H/P Settlement Agreement. Home therefore insisted on entitlement to one third of the $800,000 Ochoa settlement pursuant to the H/P Settlement Agreement, to be credited towards the amounts Home had paid to Pan American. Pan American rejected this demand and Home responded by filing this action, seeking to recover one third of the $800,000 Ochoa settlement, plus interest and attorneys' fees.

In the course of the proceedings, Home filed for summary judgment alleging (1) breach of the H/P Settlement Agreement, and (2) fraudulent inducement of the H/P Settlement Agreement. Pan

American cross-motioned on Home's claim of breach of the H/P Settlement Agreement, and opposed the claim of fraudulent inducement, moving for summary judgment on both issues.

The motions were initially argued before a magistrate judge who ruled that there existed no genuine issues of material fact because the H/P Settlement Agreement was clear on its face as excluding Home from recovering for damages for loss of use of the ITB ZORRA. Home Ins. Co. v. Pan Am. Grain & Mfg. Co., Inc., No. 00-1184 (D. P.R. Apr. 19, 2002) ("Report and Recommendation"). Thus, the magistrate judge concluded that, as a matter of law, Pan American did not breach the terms of the H/P Settlement Agreement when it failed to notify Home, or seek Home's approval, of the Ochoa settlement. The magistrate judge further found that the Ochoa settlement constituted an "award" because it was "an agreement granted by a formal process -- a mutually agreed upon resolution to negotiation bound by voluntary signatures of the involved parties." Report and Recommendation at 7. In so ruling, the magistrate judge relied on Black's Law Dictionary, Pocket Edition 54 (Bryan Garner et al., ed. 1996), which defines "award" as "to grant by formal process or by judicial decree." See Report and Recommendation at 7. The magistrate judge, in effect, considered that if the term "award" referred only to the result of a formal judicial process, it would be redundant to the alternative term, "verdict," contained in the H/P Settlement Agreement, which

-6-

also encompasses a judicial decision. Id. at 7-8. He thus found that the Ochoa settlement was an "award," and that therefore Home was not entitled to share in that settlement under the terms of the H/P Settlement Agreement. Additionally, the magistrate judge decided that because the Ochoa settlement "plainly states that the payment of $800,000 is to settle 'claims or future claims for loss of use of property,'" id. at 10, the recovery of such damages was excluded by the specific terms of the H/P Settlement Agreement.

The magistrate judge's reasoning and recommendation that summary judgment be granted in favor of Pan American was adopted in essence by the district court, see Home Ins. Co. v. Pan Am. Grain & Mfg. Co., Inc., 286 F. Supp. 2d 190 (D. P.R. 2003), and this appeal was taken from that decision.

The standard of review of a district court's grant of summary judgment is de novo. Tum v. Barber Foods, Inc., 360 F.3d 274, 279 (1st Cir. 2004). The same standard of review is applicable to a district court's interpretation of a settlement agreement, because it essentially involves the revisiting of a question of law. See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 311 F.3d 450, 451-52 (1st Cir. 2002).

**I.**

We disagree with the district court's interpretation of the term "award." Under Puerto Rican law, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the

contracting parties, the literal sense of its stipulations shall be observed."  31 P.R. Laws Ann. § 3471 (1991).  This court has endorsed the Puerto Rico Supreme Court's conclusion that "clear" terms are those that "in themselves are lucid enough to be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation . . . ." Heirs of Ramírez v. Superior Court, 81 P.R.R. 347, 351 (1959) (internal citation omitted), quoted in Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir. 1987); see also Borschow Hosp. & Med. Supplies, Inc. v. César Castillo, Inc., 96 F.3d 10, 15-16 (1st Cir. 1996) (espousing same standard).  Our disagreement with the district court about the meaning of "award" does not suggest that the term itself admits of ambiguity.  It is our view that the interpretation below went beyond the clear meaning of the term as used in legal writing in general, and in the H/P Settlement Agreement in particular, by misconstruing the voluntary settlement negotiation between parties as the kind of "formal process" referred to in the Black's pocket edition definition.

Black's Law Dictionary 137 (6th ed. 1990) defines "award" in keeping with our understanding of what that term means in everyday legal parlance:

> **award**, vb.  To grant, concede or adjudge to.
> To give or assign by sentence or judicial
> determination or after careful weighing of
> evidence.  Thus, a jury awards damages; the
> court awards an injunction; one *awards* a

-8-

contract to a bidder.  To confer as being deserved or merited.

**award**, <u>n</u>.  The decision or determination rendered by arbitrators or commissioners, or other private or extrajudicial deciders, upon a controversy submitted to them; also the writing or document embodying such decision.

Clearly, the Ochoa settlement does not come within the definition of "award" when used as a noun, as it is not a extrajudicial determination by third party decision makers such as would be the case of an award by an arbitrator.  Furthermore, the Ochoa settlement certainly is not a "document embodying" such a decision.  Rather, the Ochoa settlement is the product of a private negotiation between parties to a lawsuit.  Neither does the Ochoa settlement come within the principal definition of "award" when used as verb, which connotes judicial or quasi-judicial action "after careful weighing of evidence."  Even the secondary meaning of its use as a verb, as "[t]o confer as being deserved or merited," which refers to events such as the granting of an honor, title, or medal, implies unilateral action by the grantor, rather than a multi-party negotiation of the sort which takes place in the settlement of a dispute.  Such a definition does not encompass the Ochoa settlement.

Most important to our view, and a factor apparently not considered by the district court, is that it is difficult to countenance that sophisticated parties such as those involved in the H/P Settlement Agreement, represented by counsel, would not

-9-

have used the term "settlement" rather than "award" had they intended to also exclude negotiated settlements, as the term is normally used, from the H/P Settlement Agreement. The term "settlement" is well known to attorneys, and its meaning is distinctly different from what is normally understood to be meant by the term "award." See id. at 1372 (defining "settlement").

Indeed, the text of Paragraph (6) of the H/P Settlement Agreement, when read as a whole, further supports the common-sense interpretation that an "award" is distinct from a "settlement." It indicates that Home will obtain "the lesser of $1,333,000 or one-third of . . . [any] recovery made, whether obtained by way of suit, arbitration, claim, verdict, award, settlement, or otherwise," but excludes from such recoverable amounts only "any verdict or award in favor of Pan American that specifically and separately award(s) Pan American a recovery for punitive damages and/or loss of use." H/P Settlement Agreement at para. 6 (emphasis supplied). It then goes on to allow Home to also share in additional recoveries "whether obtained by way of suit, arbitration, claim, verdict, award, settlement, or otherwise, in excess of $10,000,000 (excluding any recovery for punitive damages and/or loss of use as described above)." Id. (emphasis supplied). The omission of "settlement" from the description of those recoveries of punitive damages and loss of use that are not subject to sharing, in the same paragraph where the term was twice

-10-

explicitly included elsewhere, strongly suggests a recognition that the types of recoveries that <u>were</u> described -- "award" and "verdict" - do not themselves incorporate a settlement.

We have no doubt that the Ochoa settlement was not an "award" from which Home was excluded in participating under the H/P Settlement Agreement.

**II.**

The district court also erred in concluding that the Ochoa settlement was excluded from the terms of the H/P Settlement Agreement as a recovery for loss of use of the ITB ZORRA. We are inevitably led to this conclusion by the text of the Ochoa settlement itself.

As a result of a complaint filed against Ochoa and others in which Pan American claimed "extensive fire damage to the tug" and sought compensation for "damages, losses, and expenses to the tug" in the amount of $31,000,000, <u>Pan Am. Grain Mfg. Co.</u> v. <u>Continental Grain Co., Inc.</u>, No. 97-7748 (D. P.R. filed Aug. 19, 1997), Ochoa entered into a settlement agreement with Pan American. That agreement states, in relevant part:

> 1. <u>SETTLEMENT</u>. The undersigned, Pan American . . ., for and in consideration of the payment of $800,000, as more particularly described in paragraph 2 below, . . .does hereby remise, release and discharge . . . [Ochoa] . . . of and from <u>all</u> actions, causes of action, suits, claims, damages, covenants, contracts, agreements, judgments, costs and demands, whatsoever in law or in equity, foreseen or unforeseen, matured or unmatured, known or

-11-

unknown, accrued or not accrued, in connection with the incident that occurred on the 24th day of April, 1995, . . . which allegedly caused loss of use of property and damage to property of [Pan American] . . . .

2. PAYMENT TO RELEASING PARTY. By express agreement of the parties hereto, the $800,000 payment made by the [Pan American] . . . is allocated . . . in settlement of [Ochoa's] claims or future claims for loss of use of property

. . .

4. FULL AND COMPLETE SETTLEMENT. [Pan American] acknowledges that this SETTLEMENT . . . is expressly intended to be a full and complete settlement of all disputed claim(s) made or which could be made between [Pan American] and [Ochoa] arising out of the April 24, 1995 incident described above . . . .

Ochoa settlement at 3-4 (emphasis supplied).

The district court determined that a reading of Pan American's claims against Ochoa, combined with the Ochoa settlement, did not provide "sufficient evidence to determine that said agreement was not for loss of use. On the contrary the settlement agreement specifically states that it is in settlement of 'claims or future claims for loss of use of property.'" Home Ins. Co. v. Pan Am. Grain & Mfg. Co., Inc., 286 F. Supp. 2d at 196-97. This analysis leaves aside the contents of paragraphs 1 and 4 of the Ochoa settlement, which make explicit that the $800,000 was paid in consideration not only for Ochoa's release from any claims of loss of use, but for its release from all possible claims, on

-12-

the basis of any cause of action, which arose from the fire on the ITB ZORRA.[4]  Thus, even were negotiated settlements for loss of use -- as opposed to verdicts or awards for loss of use -- excluded from the notice, approval, and sharing provisions of the H/P Settlement Agreement, the Ochoa settlement, insofar as it also settled other claims, was not so excluded.

### III.

From the record before us it is clear that the Ochoa settlement is neither an "award" nor a "verdict."  Furthermore, irrespective of how the proceeds of that settlement may have been labeled by Pan American, they cannot properly be construed as exclusively for loss of use of the ITB ZORRA.[5]

We thus must conclude that the district court erred in not finding that Pan American breached the H/P Settlement Agreement when it failed to notify Home of the Ochoa settlement prior to entering into the same, and when it refused to share in the

---

[4]  In this respect it is noteworthy that the claims Pan American filed against Ochoa did not include a demand for damages for "loss of use," but rather for "damages, losses, and expenses to the tug."

[5]  Indeed, there is little reason to believe that the proceeds have any connection to loss of use; we earlier described the event as one in which the ITB ZORRA "caught fire and thereafter was lost as a result of the conflagration."  See Pan Am. Grain Mfg. Co., Inc. v. P.R. Ports Auth., 295 F.3d at 113.  If the tub was a total loss, then under maritime law there could be no recovery for loss of use, see A & S Transp. Co., Inc. v. Tug Fajardo, 688 F.2d 1,2 (1st Cir. 1982), and labeling any part of the payment as for loss of use would be nothing more than an attempt on Pan Am's part to keep all of the Ochoa settlement by purporting to bring the payment within the H/P Settlement Agreement.

recovered proceeds in the manner specified by the H/P Settlement Agreement.

We have considered all other arguments of the parties, and determined that they are without substance.

The judgment of the district court is reversed and the case is remanded with instruction that judgment be entered on behalf of Home, in the manner consistent with this opinion.

Considering that this is an action brought pursuant to our diversity jurisdiction, Home shall be entitled to recover reasonable attorney fees and costs.

**Reversed and remanded**.

(6) Pan American and/or the ZORRA and/or Zorra Transport Inc.("Zorra Transport") will pay The Home the lesser of $1,333,000 or one third of the gross aggregate recovery made, whether obtained by way of suit, arbitration, claim, verdict, award, settlement, or otherwise, from or against any and all person(s) for damage to Pan American and/or the ZORRA, and/or Zorra Transport arising out of or relating to the Fire, excluding only that portion, if any, of any verdict or award in favor of Pan American that specifically and separately award(s) Pan American a recovery for punitive damages and/or loss of use. If Pan American and/or the ZORRA and/or Zorra Transport make a gross aggregate recovery, whether obtained by way of suit, arbitration, claim, verdict, award, settlement, or otherwise, in excess of $10,000,000,(excluding any recovery for punitive damages and/or loss of use as described above) then Pan American and/or the ZORRA and/or Zorra Transport will pay The Home one-third of any gross amount in excess of $10,000,000 up to $2,000,000, in addition to the above $1,333,000.

(7) The Home's written approval of any settlement by Pan American and/or the ZORRA and/or Zorra transport of any claim against any person for damage arising out of or relating to the the Fire, out of which The Home is to receive all or part of the above amount of $1,333,000 is a condition precedent to any agreement to any such settlement. The Home agrees that it will not unreasonably withhold its written approval. The Home's approval is not a condition precedent to any settlement out of which The Home is not to receive any part of the above amount of $1,333,000.

(8) Prior to requesting any required approval from The Home of any settlement, and prior to agreeing to any settlement or satisfaction of any judgment or award out of which The Home is to make a recovery under this agreement, Pan American will advise the prospective settling or paying party that The Home has an economic interest in the settlement or satisfaction if Pan American and The Home jointly agree that such information will maximize the recovery or will obtain some other mutually advantageous result. The payment of any such settlement or satisfaction shall be made by check(s) or bank draft(s) made payable to both Pan American and The Home.  In the event the information is not disclosed, Pan American agrees and undertakes that payment of any settlement or satisfaction shall be made by check(s), bank draft(s), or wire transfer(s) to Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., as attorneys for Pan American Grain Manufacturing Co., Inc., and that such funds will be held in trust or escrow by Chaffe McCall, to be disbursed pursuant to the terms and conditions of this agreement only after

disbursement has been agreed to, approved, and authorized in writing to Chaffe McCall by Pan American and The Home.