# United States Court of Appeals
## For the First Circuit

No. 05-1141

SAILOR INCORPORATED F/V,

Plaintiff, Appellee,

v.

CITY OF ROCKLAND,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
and Schwarzer,[*] Senior District Judge.

William H. Welte with whom Welte & Welte, P.A. was on brief for appellant.
Clayton N. Howard with whom Howard & Bowie, P.A. was on brief for appellee.

November 4, 2005

---

[*]Of the Northern District of California, sitting by designation.

**BOUDIN**, **Chief Judge**.  This appeal arises from the sinking of a fishing vessel, the M/V SAILOR ("SAILOR"), while docked at the Rockland Fish Pier ("Fish Pier") owned by the City of Rockland, Maine ("Rockland").  A jury found that Rockland's negligence caused the sinking, and it awarded damages to the company that owned the vessel in the amount of $202,088.  Rockland now appeals, seeking reversal of the district judge's denial of its motions for judgment as a matter of law or new trial or, in the alternative, for remittitur of the damages award.

SAILOR was a 75-foot "scalloper," owned, through his company, by Gary Hatch and captained by Myron Benner.  The Fish Pier was initially operated through a lease agreement by Water Street Management ("Water Street"), but on January 1, 2002, the lease was terminated and Rockland assumed full operation and management of the Fish Pier.

SAILOR docked at the Fish Pier on February 9, 2002, in its assigned berth.  On February 12, 2002, Hatch and Benner moved SAILOR from its assigned berth to the take-out berth (a common berth that is primarily used for the unloading of hauls), where it remained until the early morning of February 16, 2002.  Sometime during the night or morning the hull of the SAILOR was pierced by an exposed bolt on the Fish Pier, causing the vessel to sink.

Hatch filed suit against Rockland on October 10, 2003, in Maine state court, and Rockland, invoking general maritime law,

-2-

removed the case to federal district court. Partial summary judgment was granted in Rockland's favor limiting liability to the fair market value of the SAILOR prior to sinking. At the close of trial, the jury, using a special verdict form, found that Rockland's negligence had caused the sinking and that Hatch had not been negligent. The jury set the fair market value of the SAILOR, including prejudgment interest, at $202,088.

On this appeal, Rockland seeks reversal of the district court's denial of its motion for judgment as a matter of law or new trial, or in the alternative, a remand to the district court for a new trial to apportion fault between Rockland and SAILOR. As a final alternative, Rockland requests a remittitur, contending that the damage award is not supported by the evidence. The remittitur would give Hatch the choice of accepting a lower figure fixed by the court or facing a new trial on damages.

Our review is de novo as to the motion for judgment as a matter of law. Nonetheless, "our scrutiny of the jury verdict is tightly circumscribed; we will reverse only 'if a reasonable person could not have reached the conclusion of the jury.'" Foisy v. Royal Maccabees Life Ins. Co., 356 F.3d 141, 145 (1st Cir. 2004) (quoting White v. N.H. Dept. of Corr., 221 F.3d 254, 259 (1st Cir. 2000)). As to the motion for new trial, we review for abuse of discretion, bearing in mind that a district court "may set aside a jury's verdict and order a new trial only if the verdict is so

clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 13 (1st Cir. 2004) (quoting Federico v. Order of Saint Benedict in Rhode Island, 64 F.3d 1, 5 (1st Cir. 1995)).

The legal framework as to negligence in this situation is straightforward. The wharf owner must exercise the diligence to maintain its berths in a safe manner and to remove any "dangerous obstruction" or warn of its existence. Pan Am. Grain Mfg. Co. v. P.R. Ports Auth., 295 F.3d 108, 114-15 (1st Cir. 2002). This extends to dangerous conditions of which the wharf owner knows or should have known. Smith v. Burnett, 173 U.S. 430, 433 (1899). Yet the vessel too must use "ordinary care," avoiding dangerous conditions that are known to the operator or are obvious. Id.; Pan Am. Grain Mfg., 295 F.3d at 115.

On appeal, Rockland first objects to the finding that its negligence caused the sinking. The jury heard evidence that before Rockland took over the wharf, it did not perform necessary repair and maintenance requested by Water Street, and that after it took over there was no policy of inspection or maintenance; Water Street had performed such functions regularly. The city manager conceded that the Fish Pier was in "disarray" when the city began its own management, which it regarded as a "caretaker" role until a new operator could be found.

-4-

Although the jury thus had ample basis to find negligence by Rockland in the operation of the wharf, causation was a closer question. Hatch's position at trial was that the take-out berth should have had "camels"--logs shielded by rubber tires--to keep vessels from rubbing against the concrete piers; alternatively, Hatch charged that it was negligent for Rockland to allow an exposed bolt to protrude from the pier. Both theories assumed, with adequate basis in the evidence, that the SAILOR had chafed against an exposed bolt which ultimately holed the vessel and caused her sinking.

The first theory was weak; the absence at the take-out berth of camels, present in regular berths, seemingly facilitated unloading and anyhow this absence was obvious to Hatch and Benner. In fact, Hatch placed two polyethylene buffer balls ("polyballs") between SAILOR and the pier, although in the end this proved insufficient to protect the vessel. There were also chafe boards on the side of the pier--a further precaution: it appears likely that one board was absent or split during the night and that a bolt, thus exposed, was the immediate cause of the sinking.[1]

---

[1]From the photographs and descriptions in evidence, it appears that the piers are solid concrete, covered with a deck of wooden planking. The wooden planking extends beyond the concrete on either side, and wooden pilings extend down from the planking into the water, lining the concrete railroad-tie-style; it is to these pilings that the chafe boards are bolted.

Hatch's second theory (that the exposed bolt bespoke causal negligence on the part of Rockland) is sufficient, given the deference due to a jury's factfinding. N.H. Dept. of Corr., 221 F.3d at 259. The situation is confused because the chafe board may have been in place on the afternoon before the sinking and split during the night. If the board was missing in the afternoon, then the bolt was already exposed, and Rockland now argues that it was an obvious hazard that should have led Hatch to remove either the bolt or the vessel; if the board split off during the night, then Rockland says it was not negligent in failing to cope with a new hazard of which it was not aware.

However, the guilty bolt lay close to the water at low tide, and assuming the board was not in place, this could have been a hazard that a regular wharf-owner inspection would have discovered and dealt with, yet it could still not have been obvious to Hatch and Benner from the deck of a large vessel. And, if the board was present but was chafed away at night, the jury could have inferred negligence in maintaining the boards. Absent contrary evidence, it is a permissible inference that a properly maintained board would not suddenly break apart in the normal weather conditions that prevailed. Or at least a reasonable jury could so conclude, which is all that is necessary. Autokirey, 379 F.3d at 9.

Rockland's stronger argument--but not quite strong enough--is that SAILOR's own negligence was the true cause, or at least a contributing cause, of the accident. Under maritime law, the former would arguably eliminate liability for Rockland and the latter would permit an apportionment of damages. Carey v. Bahama Cruise Lines, 864 F.2d 201, 207-08 (1st Cir. 1988). The evidence raised a set of doubts about the conduct of Hatch and his captain, any of which might have persuaded a jury of their negligence; but none of them compelled that conclusion. We address them individually.

First, Hatch moored the vessel for several days at the take-out berth, which plainly had no camel. If the chafe board was already missing or damaged and if the exposed bolt was readily visible from the deck, arguably Hatch could not reasonably have left the situation as it was; however, there is no conclusive proof that these premises are correct. Alternatively, a jury might have thought that the two polyballs employed by Hatch were not enough; but nothing in the evidence (there were conflicting expert opinions on the issue) clearly compelled that conclusion.

Rockland also criticizes the amount of slack that Hatch left in the lines that moored the SAILOR to the pier, arguing that it was excessive and allowed the SAILOR to chafe against the pier more than usual, contributing to the wearing away of the chafe board or SAILOR's hull (or both). Once again, there were

conflicting expert opinions presented at trial on the sufficiency of the mooring: Hatch (testifying as an expert) stated that the conditions on the evening in question were normal, and that the SAILOR was tied up according to his usual practice; Rockland's expert testified that the mooring was, in his opinion, insufficient.  The jury was entitled to credit Hatch's expert testimony over Rockland's.

Next, Rockland's brief on appeal says that there was worm damage to the vessel and that the repair measures (e.g., sheathing) had not been adequate to prevent a weakening of the boards where the bolt had pierced the hull.  But whether the repair measures were negligent and whether the weakened boards played a causal role were hardly clear-cut.  Again, this was a choice for the jury.

Finally, it is claimed that SAILOR's owner or captain had a duty "to tend" the vessel--Rockland's suggestion being that one of the two should have visited the vessel overnight, checked the lines, and discovered and remedied any undue movement and chafing against the pier.  That a vessel-owner or operator has a duty of reasonable care in securing the vessel is well-established, Smith, 173 U.S. at 433, but there is no law that this automatically requires overnight visits to the vessel nor any showing of circumstances in this case that required the jury to find such visits necessary.

We conclude that the district court properly refused to overturn the jury's verdict as to liability. In some cases, the evidence might preclude judgment as a matter of law and yet lean so heavily in the other direction so as to justify a district judge in ordering a new trial. 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2531 (1995); Nat'l Car Rental Sys. v. Better Monkey Grip Co., 511 F.2d 724, 730-31 (5th Cir.), cert. denied, 423 U.S. 894 (1975). It would be much rarer to find that the district judge, who observed the trial, had "abused his discretion" (the relevant standard) in refusing to order a new trial. E.g. Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994). No such abuse occurred in this case.

Damages are the final target of Rockland's appeal. The treatment of damages by a federal appellate court is potentially complicated in at least two ways: first, the curious limitation that requires use of remittitur (as opposed to judgment as a matter of law) to remedy an excessive verdict, 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2815, at 159-60 (1995); and second, some arguable tension in the case law as to the standard of review of a denial of remittitur by the district court: commonly, courts say that review is for "abuse of discretion," but the problem and some of the case law may be more subtle.

We need not pursue these issues because, in the present appeal, Rockland has invoked a test taken from our case law,

namely, that a "jury's damage award should be upset if [quoting from our decision] it 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence . . . .' Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003)." Hatch has pointed to the same language in his answering brief, and we use this as an undisputed standard.

In this case, the jury award was for $202,088. But as the district court pointed out (in its post-judgment decision on remittitur), the jury was told that prejudgment interest could be included in its discretion. Carey, 864 F.2d at 208 n.6. Working backward from the specified rate of annual interest, the district court deemed it reasonable to impute a value of $168,929 to the vessel, with the balance representing interest on this figure. Hatch argues on appeal that--using somewhat different formulas and assumptions as to dates--the jury may have found a vessel value as low as $161,000.

Rockland grumbles about the assumption that the jury did in fact allow for prejudgment interest, but the assumption does not turn on mind-reading of the jury: the verdict is not irrational if under the governing law the evidence permitted a rational jury to impose liability and award damages in the amount reflected in the verdict. If the evidence permitted the jury's result, then whether the jury reasoned properly in reaching it is a matter over which

-10-

the law ordinarily draws a veil.  See Fed. R. Evid. 606(b); Ramos v. Davis & Geck, Inc., 224 F.3d 30, 31-32 (1st Cir. 2000).

In this case, the jury was offered much evidence supporting a value of the vessel well under $169,000.  Hatch had purchased the SAILOR two years before the sinking for $35,000, and it was apparently insured for an "agreed value" of $50,000 at the time of its loss.  Yet there had been refurbishment in 2001, also the subject of evidence, and the issue was the refurbished vessel's fair market value at the time it sank, which could easily be well above the original purchase price.

At trial, Rockland's expert estimated the value of the vessel just before its sinking as between $80,000 and $100,000.  Hatch's expert made his own estimate of $120,000; but he was called by Rockland, not Hatch, and his testimony did not prevent the jury from awarding more, if more was rationally supported by evidence. The evidence for a higher figure was furnished by Hatch himself: citing his own experience as a captain and maritime surveyor, he opined as an expert witness that the vessel had been worth between $166,000 and $189,000; indeed, he later adjusted his testimony to support a figure as high as $199,000.

Obviously, Hatch was subject to being discredited, both because of his patent self-interest and because both of the other experts had arrived at lower figures.  E.g., Shane v. Shane, 891 F.2d 976, 982 (1st Cir. 1989).  But Rockland does not deny that

Hatch was entitled to testify as an expert, and the jury was free to weigh the credentials of the witnesses and the cogency of the bases given for their opinions. This is the kind of fact and credibility judgment on which the jury is ordinarily entitled to great latitude. See Primus v. Galgano, 329 F.3d 236, 244-45 (1st Cir. 2003).

The latitude is not unlimited: one can imagine a case where, when the details of the testimony are examined, a jury could rationally accept one expert's view but could not accept the other's. See Sullivan v. Nat'l Football League, 34 F.3d 1091, 1105 (1st Cir. 1994), cert. denied, 513 U.S. 1190 (1995). Here, Rockland's brief makes no effort to set out the reasoning of the experts and explain why its expert's discussion is compelling and Hatch's so weak that no rational jury could accept it. Without such a showing, we have no basis for saying that Hatch's estimate of $166,000-$189,000 had to be disregarded.

The verdict rendered by the jury--attributing to it a value of $169,000 for the vessel--fits within Hatch's estimate. From the surface facts, it appears that the jury was generous in accepting Hatch's estimate over and above the more modest figure offered by Rockland's expert and the expert whom Hatch himself retained but did not proffer as a witness. Yet this does not show that the jury acted irrationally. Autokirey, 379 F.3d at 13.

As a tail-end argument, Rockland complains that it was unreasonably limited in cross-examining Hatch. The district court did permit considerable cross-examination into Hatch's experience and history. However, when Rockland's counsel sought to cross-examine Hatch as to whether he had been involved in the sinking of two other vessels before SAILOR's demise, the district court sustained an objection to the line of inquiry under Fed. R. Evid. 403. That provision gives the district judge ample discretion to exclude testimony where its probity is substantially outweighed by prejudice, confusion or the like.

What Rockland fails to mention is that before ruling on the objection, the court inquired whether Rockland intended to bring out evidence that Hatch had been negligent in connection with the earlier sinkings. Rockland conceded that it had no such evidence, and it did not suggest that it expected to adduce it from Hatch. Absent such evidence, the threshold relevance of the prior sinkings is not apparent, and Rockland's brief furnishes no explanation of the relevance of the questions. Nothing more need be said on the Rule 403 determination.

The district judge suggested that, on these facts, he would not have ruled this way. Indeed, this is a close case for apportioning all fault to Rockland, and one's confidence in the result is not increased by the rather generous damages award. However, we put our faith in juries to resolve close cases, and

-13-

although the appeal has been ably briefed, the jury verdict is not irrational.

<u>Affirmed</u>.