# United States Court of Appeals

## For the First Circuit

No. 09-1969

WELLS REAL ESTATE INVESTMENT TRUST II, INC.,

Plaintiff, Appellant,

v.

CHARDON/HATO REY PARTNERSHIP, S.E.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before
Lynch, Chief Judge,
Torruella[*] and Lipez, Circuit Judges.

Robert I. Steiner, with whom Damon W. Suden, Kelley Drye & Warren, LLP, Ricardo F. Casellas, and Casellas, Alcover & Burgos, P.S.C., were on brief, for appellant.
Eric A. Tulla, with whom Maritza I. Munich, Lillian Frattallone, José Baqué, Iris J. Cabrera, and Rivera, Tulla & Ferrer were on brief, for appellee.

August 5, 2010

---

[*]Circuit Judge Torruella heard oral argument in this matter and thereafter recused himself. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. § 46(d).

**LIPEZ**, <u>Circuit Judge</u>.  This dispute arose after plaintiff Wells Real Estate Investment Trust, Inc. (Wells) entered into an agreement with defendant Chardón/Hato Rey Partnership, S.E. (Chardón) for the purchase of a commercial building in San Juan, Puerto Rico.  Prior to the expected closing date, a large fuel spill occurred at the property, causing significant damage and displacing the building's tenants.  Chardón insisted on proceeding to closing over Wells' objections.  After Wells failed to appear for the scheduled closing, both parties filed claims for breach of contract.

Wells appeals from the court's grant of summary judgment in favor of Chardón on Wells' claims for breach and resolution of contract and Chardón's counter-claim for breach of contract.  After careful review, we affirm the judgment in part, vacate in part, and remand for further proceedings consistent with this opinion.

**I.**

**A. The Purchase and Sale Agreement**

On January 25, 2008, Wells entered into a Purchase and Sale Agreement (the Agreement) with Chardón by which Wells agreed to purchase the American International Plaza building in San Juan (AI Plaza) for $80 million.  Pursuant to the Agreement, Wells placed a $4 million deposit in escrow and agreed to pay the $76 million balance at closing.

Section 2.1 of the Agreement defined the "Property" that Wells agreed to purchase from Chardón:

> 2.1    Property.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Real Property, the Improvements, and all of Seller's right, title, and interest in the Leases, in the Tangible Personal Property, in the Intangible Personal Property, and in the Service Contracts (as such terms are defined below) (all of which are collectively referred to as the "Property").

Article 6 of the Agreement addressed "OPERATIONS AND RISK OF LOSS." Section 6.1.3 set forth Chardón's ongoing maintenance obligations from the effective date of the Agreement, January 25, through closing:

> 6.1.3. Maintenance of Improvements; Removal of Personal Property. Subject to Sections 6.2 and 6.3, Seller shall maintain or cause the tenants under the Leases to maintain (to the extent provided in such Leases) all Improvements substantially in their present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with Seller's maintenance of the Improvements during Seller's period of ownership. Seller will not remove any Tangible Personal Property except as may be required for necessary repair or replacement.

Section 6.2, entitled "Damage," set forth the parties' rights and obligations in the event that "prior to Closing the Property is damaged by fire or other casualty." If such a casualty occurred, "Seller shall estimate the cost to repair and the time required to complete repairs and will provide Purchaser written

-3-

notice of Seller's estimation (the 'Casualty Notice') as soon as reasonably possible . . . ."  Section 6.2.1 defined "Material Damage" as "damage which, in Seller's reasonable estimation, exceeds $4,000,000 to repair," and provided that "[i]n the event of any Material Damage to or destruction of the Property or any portion thereof prior to Closing, Purchaser may, at its option, terminate this Agreement" and recover its deposit.  Section 6.2.2 provided that if "the Property is not Materially Damaged, then Purchaser shall not have the right to terminate this Agreement;" instead, Chardón could either repair the nonmaterial damage in a manner reasonably satisfactory to Wells or credit Wells at closing for the reasonable cost to complete the repairs.

Section 7.3 required Chardón to deliver certain documents to the escrow agent on or before the closing date, including "tenant estoppel certificates" by which AI Plaza tenants warranted certain information about their leases.[1]  Under Section 7.3.7, Chardón was required to deliver "Tenant Estoppel Certificates for the Leases" executed by tenants such that the tenants who executed estoppel certificates, in the aggregate, "occupy 75% of the leasable space in the Improvements (the 'Required Estoppels')." The Agreement specified that "[i]t shall be a further condition to

---

[1] For example, the tenant estoppel certificates contained information about the date of the tenant's lease, the square footage of the leased property, and the amount of the security deposit, and provided assurances that the lease remained in force and had not been amended or modified except as indicated.

-4-

Purchaser's obligation to close the transaction" that "the Required Estoppels, do not . . . reflect any material discrepancies of the terms of the Leases as compared with the terms of the Leases set forth in the copies of the Leases delivered by Seller . . . ." However, this section also stated that Wells' remedies for Chardón's failure to deliver the required estoppels were limited: "If Seller is unable to deliver the Required Estoppels" by the closing date, "then Purchaser's sole remedies and recourses shall be limited to either (A) waiving the requirement for the tenant estoppel certificate(s) in question and proceeding to Closing without reduction of the Purchase Price or (B) terminating this Agreement by immediate notification to Seller" and recovering any deposit.

**B. The Fuel Spill**

Prior to closing, the transformer for AI Plaza's main electrical service failed on February 10, 2008, and the building's two diesel-powered back-up generators began operating. Late on February 11 or early on February 12, a large diesel fuel spill occurred. About 1,200 gallons of fuel spilled from the maintenance room on the building's top floor into other parts of the building. As a result of the spill, AI Plaza required significant remediation, repair, cleaning and restoration, and its tenants were forced to vacate the building. Chardón obtained the necessary

clearances to reopen the building for occupancy on March 26, and the majority of tenants returned by the end of May.

On February 15, Chardón notified Wells by letter that a fuel spill had occurred at AI Plaza and that Chardón's initial estimate of the cost to clean up the spill and repair the damage to repair "the Property" was $650,000.[2]  Chardón stated that pursuant to Section 6.2.2 of the Agreement, which governed nonmaterial damage, it elected to complete a portion of the clean-up and repair prior to closing and credit Wells for the remaining costs of repair.  The following week, Wells responded with concern that "this estimate may be unduly low, and indeed the Property may have been Materially Damaged, as that term is defined in Section 6.2.1," and requested further information and documentation supporting Chardón's estimate.

On March 6, Chardón advised Wells that it believed remediation of the fuel spill was "95%" complete.  Chardón provided a revised estimate of $2,546,509 for the "expected costs to complete the environmental cleanup, restoration, and subsequent certification relative to the diesel oil spill," and an additional $100,000 for replacement of the transformer for the building's main electric service.  Wells again expressed concern about the reasonableness of Chardón's repair estimate, noting that "we are

_____

[2] Chardón's letter stated that "[a]ll capitalized terms used herein that are not expressly defined herein shall have the meaning ascribed to them in the Agreement."

-6-

still reviewing this latest estimate but believe that it too may fall short of fully estimating the substantial damages incurred at the Property" due to the fuel spill.

In the course of litigation, Chardón produced expert evidence that the actual total cost to repair the physical property was $3,606,407. Chardón also incurred additional costs in order to "maintain cordial relations with the tenants," but did not consider these expenditures to be repair costs within the meaning of the Agreement. These additional costs included $2,343,878 in rent and other abatements to AI Plaza tenants, $671,804 in other "tenant benefits," and $208,489 in "payments related to tenant benefits."[3]

## C. Tenant Estoppel Certificates

Prior to the fuel spill, Chardón delivered tenant estoppel certificates to Wells on February 6, 2008, pursuant to Section 7.3.7 of the Agreement. Several days later, Chardón and Wells representatives had a phone conversation in which Wells raised concerns about apparent discrepancies in several of the estoppel certificates provided, and Chardón attempted to assuage

---

[3] The $671,804 in other "tenant benefits" included a $1,000 credit toward a hotel stay for each employee who facilitated a tenant's move to a temporary location, a $50-per-employee credit toward a tenant employee event, a $250 dinner-package giveaway for each floor of the building, flowers and breakfast upon the tenants' return to the building, and the equivalent of 60 days' rent for each tenant toward tenant improvements at the building. The $208,489 in "payments related to tenant benefits" included payments for third party consulting services, infrared inspection, and indoor air quality analyses.

Wells' concerns.  On February 11, Wells sent an email to Chardón listing "a few issues arising under the estoppels delivered last week" and stated that "[t]hese matters must be resolved to Wells' satisfaction prior to closing."[4]

On March 3, after the fuel spill, Wells reiterated to Chardón that the estoppel certificates delivered on February 6 did not satisfy Section 7.3.7 of the Agreement and that issues related to the estoppels "remain[ed] outstanding."  Wells further noted that in the wake of the fuel spill, local media had reported that some tenants might not return to AI Plaza, and therefore Wells requested that Chardón provide new, satisfactory estoppel letters from all tenants.  In letters dated March 11 and March 12, Wells again stated that the estoppel certificates provided on February 6 were not satisfactory and noted that new estoppels had not been provided after the fuel spill as requested.  Chardón did not provide Wells with new estoppel certificates prior to closing.  At the same time, Wells did not notify Chardón that it wished to

---

[4] Wells' email detailed concerns with the estoppel certificates executed by six tenants.  For example, the email stated that "Goldman Antonetti alleges overpayment in rent due to a miscalculation in the SF arising from the time of the second amendment.  This could obviously be a material issue for both parties"; "Charles Schwab alleges an outstanding demising allowance that, if not yet paid, will need to be credited to purchaser at closing.  If Seller has already paid this amount, please send appropriate evidence"; and "[t]he ETS estoppel shows 3,205 SF, but the lease says 3,025.  This appears to be a typo and needs to be fixed.  A handwritten change initialed by the tenant will suffice."

terminate the Agreement due to Chardón's alleged failure to provide satisfactory estoppel certificates.

## D. Closing

Following postponement of the original closing date, on March 10, Chardón notified Wells that the new closing date would be March 14. On March 11, Wells objected to Chardón's attempt to proceed to closing at that time, stating that Chardón had "failed to comply with its obligations and satisfy all of the conditions of Closing." In particular, Wells cited Chardón's failure to provide satisfactory estoppel certificates and its failure to provide a reasonable estimate of the damages to AI Plaza. Chardón appeared for closing on March 14, but Wells did not. Both parties claimed the $4 million deposit, and the escrow agent advised the parties that it would hold the funds pending resolution of the dispute.

## E. Proceedings in the District Court

Wells filed this action in federal district court in June 2008, alleging causes of action under Puerto Rico law[5] for breach of contract and rescission or resolution of contract. See P.R. Laws Ann. tit. 31, §§ 2994, 3018, 3052. Wells sought the return of its $4 million deposit plus interest and attorney fees, alleging that (1) a reasonable estimate of the repairs to AI Plaza exceeded $4 million and therefore constituted "Material Damage" under

---

[5] The Agreement stated that it was to be "governed, construed, applied, and enforced" by Puerto Rico law.

-9-

Section 6.2.1 of the Agreement, (2) Chardón failed to deliver the estoppel certificates required under Section 7.3.7 prior to closing, and (3) Chardón failed to comply with its maintenance obligations under Section 6.1.3. Chardón filed a counterclaim alleging that Wells breached the Agreement by acting in bad faith and failing to close the transaction on March 14 and likewise sought as damages the $4 million deposit plus interest and attorney fees.

Following discovery, the parties filed cross-motions for summary judgment. Wells moved for summary judgment on the grounds that (1) a reasonable estimate of costs to repair the "Property" included costs to repair both the physical property and the leases, and therefore the undisputed facts demonstrated that a reasonable estimate of repair costs would exceed $4 million; and (2) Chardón failed to deliver the required tenant estoppel certificates free of material discrepancies prior to closing. The motion contained no concession that the cost of physical repairs alone was less than $4 million and stated that the exact cost of repairs remained a disputed fact. Chardón cross-moved for partial summary judgment on the grounds that (1) a reasonable estimate of repairs to the "Property" included only physical repairs and not expenditures such as rent abatements and tenant benefits; (2) Chardón provided the required estoppel certificates and, in any event, Wells waived that requirement; and (3) Chardón fulfilled its maintenance obligations.

The district court granted Chardón's motion and denied Wells' motion. The court then dismissed Wells' complaint and entered judgment for Chardón on its counter-claim in the amount of $4 million plus interest and attorney fees. This timely appeal followed.

## II.

On appeal, Wells contends that the district court erred in denying its motion for summary judgment and granting summary judgment for Chardón. Wells argues that the court (1) improperly granted sua sponte summary judgment as to certain issues, (2) erroneously interpreted the Agreement to mean that a reasonable estimate of costs to repair the "Property" was limited to physical repairs, (3) erred in concluding that Chardón delivered the required tenant estoppel certificates and that Wells had waived that requirement in any event, and (4) disregarded genuine issues of material fact in concluding that Chardón fulfilled its contractual maintenance obligations. Wells further contends that the court abused its discretion in denying Wells' motion to compel production of certain documents. We address each contention in turn.

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c).  We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party.  Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009).

Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply "require us to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  Adria Int'l Group, Inc., v. Ferré Development, Inc., 241 F.3d 103, 107 (1st Cir. 2001).  Although it is well-settled that the court must decide each motion for summary judgment on its own merits, this does not mean that "each motion must be considered in a vacuum.  Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time," applying the same standards to each motion.  P.R. American Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133 (1st Cir. 2010).

**A.        Sua Sponte Summary Judgment as to Material Damage Claim**

Wells contends that the district court erred in granting sua sponte summary judgment as to issues underlying its claim that AI Plaza incurred "Material Damage" as a result of the fuel spill, without first affording Wells adequate notice and an opportunity to present evidence and argument in support of its position.

In appropriate circumstances, a district court may enter summary judgment sua sponte. Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)). Given the potential unfairness of this practice, however, the district court may summarily decide a claim on its own initiative only if two conditions are met: First, discovery must be "sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts." Id. at 29. Second, the court must first "give[] the targeted party appropriate notice and a chance [in accordance with the rules] to present its evidence on the essential elements of the claim or defense." Id. In this context, "notice" requires that the nonmovant was given "reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." Levya v. On the Beach, Inc., 171 F.3d 717, 720 (1st Cir. 1999) (internal quotation marks and citation omitted); see also Stella v. Town of Tewksbury, 4 F.3d 53, 56 (1st Cir. 1993) ("[T]he notice requirement for sua sponte summary judgment demands at the very least that the parties (1) be made aware of the court's intention to mull such an approach, and (2) be afforded the benefit of the minimum 10-day period mandated by Rule 56.")

A court's sua sponte entry of summary judgment without appropriate notice is often grounds for reversal. See, e.g., Levya, 171 F.3d at 721; Berkovitz, 89 F.3d at 29. However, if the

appellant was not procedurally prejudiced by the lack of adequate notice -- that is, if the appellant was not deprived of the opportunity "to present evidence in support of its position as a result of the unfair surprise" -- then the failure to provide notice is harmless error. P.R. Electric Power Auth. v. Action Refund, 515 F.3d 57, 64 (1st Cir. 2008).

We conclude that the district court erred by entering summary judgment sua sponte as to Wells' entire Material Damage claim without appropriate notice. Wells' complaint alleged that it was entitled to recover its $4 million deposit under Section 6.2.1 because AI Plaza had suffered "Material Damage," that is, damage to "the Property" that, in Chardón's "reasonable estimation, exceeds $4,000,000 to repair." Wells moved for summary judgment on this claim, contending that under the Agreement, a reasonable estimate of costs to repair the "Property" included repairs to both the physical property and the leases (for example, rent abatement and other tenant benefits), and that it was undisputed based on Chardón's own expert evidence that those combined costs exceeded $4 million.

Chardón cross-moved for partial summary judgment only as to the contract interpretation issue. In its motion, captioned a "motion for partial summary judgment," Chardón contended that based on the clear language of the Agreement, "the Court should find, as a matter of law, that the term 'repair costs' should be limited to

physical repairs of the Property and that said term does not include tenant benefits, rent abatements or diminution of value." As the "partial summary judgment" caption suggests, Chardón's motion did not fully dispose of Wells' Material Damage claim: even if Chardón prevailed on the contract interpretation issue, Wells could still succeed on its claim based on proof that a reasonable estimate of the costs of <u>physical repairs alone</u> exceeded $4 million. Chardón did not move for summary dismissal of Wells' entire Material Damage claim and did not contend it was undisputed that a reasonable estimate of the cost of physical repairs alone fell below the $4 million threshold.

Nevertheless, the court entered summary judgment on Wells' entire Material Damage claim on its own initiative, reasoning that "[h]aving found that the cost of repair is limited to the repair of the physical structure, the Court also necessarily finds that Defendant has provided Plaintiff with a reasonable estimate of said cost" and that this reasonable estimate was less than $4 million. Prior to making its sua sponte ruling, the court gave Wells no notice that it would decide not only the contract interpretation issue of whether a reasonable estimate of repair costs was limited to physical repairs, but also the fact-intensive issue of whether a reasonable estimate of repairs to the physical property alone exceeded $4 million. The record does not reveal any order or other statement from the court indicating to the parties

-15-

that it might summarily decide the merits of Wells' entire Material Damage claim. Wells' own motion for summary judgment, which also addressed the Material Damage claim, further confirms the lack of notice. Wells stated in its motion that "[w]hile the exact amount to repair the damage to the Property remains a disputed fact in this litigation, that dispute does not require a trial, because there are several key dispositive undisputed facts upon which this Court can enter summary judgment in Wells' favor." (Emphasis added.)[6]

Moreover, we cannot say that the court's failure to provide adequate notice was harmless. Wells contends that, if it had been on notice that its entire repair costs claim was at risk of dismissal, it would have presented evidence that Chardón's estimates of repair costs unreasonably excluded some costs related to repair of the physical structure, such as the cost of certain environmental testing at the building.[7] Wells was therefore

---

[6] Contrary to Chardón's suggestion, Wells' statement was not a concession that it was undisputed that a reasonable estimate of the cost to repair the physical property was less than $4 million. Instead, Wells was arguing that the factual dispute over repair costs did not require a trial because Wells was entitled to summary judgment based on undisputed evidence that (1) a reasonable estimate of repair costs included both physical and lease-related repairs and (2) those combined costs exceeded $4 million.

[7] Invoking the general rule that arguments not first raised in the district court are forfeited, Chardón faults Wells for not contending in the district court that Chardón's estimates unreasonably excluded physical repairs and that a reasonable estimate of the cost even of physical repairs alone exceeded $4 million. However, Chardón misses the point. Because Chardón did

-16-

procedurally prejudiced by the sua sponte adjudication of its claim.[8]

**B.** **Ruling that a Reasonable Estimate of Costs to Repair the "Property" Was Limited to Physical Repairs**

Wells contends that the district court erred in concluding that a reasonable estimate of the cost to repair the Property under Section 6.2.1 "unambiguously refers to physical damage." Under Puerto Rico's Civil Code,

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.
>
> If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

P.R. Laws Ann. tit. 31, § 3471. "'[C]lear' terms are those that 'in themselves are lucid enough to be understood in one sense alone,

---

not move for summary judgment on the ground that a reasonable estimate of physical repairs was less than $4 million, and because Wells did not have notice that this issue would be decided by the court sua sponte, Wells had no obligation to raise a genuine issue of material fact as to this issue. Wells likewise had no obligation to move for summary judgment on this issue. That is especially so since Wells' position is that there was a dispute of material fact as to the total cost of repairs.

[8] Although Wells also contends that the court improperly granted sua sponte summary judgment on its resolution of contract claim, we need not reach this issue. While the court treated Wells' resolution of contract claim as if it rested only on the estoppel certificate issue, that claim also rested in part on Wells' allegation that Chardon failed to meet its contractual maintenance obligations. As discussed below, the court erred in concluding as a matter of law that Chardon fulfilled its maintenance obligations, and therefore summary judgment on the resolution of contract claim was improper.

-17-

without leaving any room for doubt, controversies or difference of interpretation.'"  Home Ins. Co. v. Pan American Grain Mfg. Co., Inc., 397 F.3d 12, 16 (1st Cir. 2005) (quoting Heirs of Ramírez v. Superior Court, 81 P.R.R. 347, 351 (1959)).  The terms of a contract "should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together."  P.R. Laws Ann. tit. 31, § 3475.  If the terms of the contract are ambiguous, extrinsic evidence is admissible to prove the parties' intent, and summary judgment is appropriate only if the undisputed extrinsic evidence of intent "supports only one of the conflicting interpretations." Adria, 241 F.3d at 111; see also Boston Five Cents Sav. Bank v. Secretary of Dept. of Housing and Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985) (approving summary judgment notwithstanding textual ambiguity if "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary" (citing 3 Corbin on Contracts § 554 (1960)).

In this case, the text of the Agreement is ambiguous. Section 6.2.1 provided that in the event of "Material Damage to or destruction of the Property or any portion thereof prior to Closing," Wells could terminate the contract and recover its deposit.  This section defined "Material Damage" as "damage which, in Seller's reasonable estimation, exceeds $4,000,000 to repair." Wells contends that a reasonable estimate of the costs to repair

-18-

the "Property" under this section must include not only repairs to the physical property but also repairs to the tenant leases -- for example, rent abatement and other tenant benefits. Wells' interpretation finds support in Section 2.1 of the Agreement, which defined the term "Property" to include "the Real Property, the Improvements, and all of Seller's right, title, and interest in the Leases, in the Tangible Personal Property, in the Intangible Personal Property, and in the Service Contracts." The Agreement further specified that all defined terms, which were indicated by initial capital letters, "shall have the meaning set forth herein." Thus, for purposes of their contractual dealings, the parties took care to specially define the term "Property" in a manner somewhat different from its ordinary meaning. See In re Blinds to go Share Purchase Litigation, 443 F.3d 1, 7 (1st Cir. 2006) ("Where the parties to a contract take pains to define a key term specially, their dealings under the contract are governed by that definition.")

We further note that Wells and Chardón, sophisticated parties represented by counsel, agreed to distinct definitions of the terms "Real Property" (the land), "Improvements" (the structures, fixtures, equipment and machinery), and "Property" (the real property, improvements, and leases, among other interests). Elsewhere in the Agreement, the parties used the terms "Real Property" or "Improvements" rather than the more inclusive term

"Property."  If the parties intended a reasonable estimate of the cost of repairs under Section 6.2.1 to include repairs to the physical property only, they could easily have referred to damage to the "Real Property and Improvements" rather than damage to the "Property."

Chardón counters that a reasonable estimate of the costs to repair the Property under this section included only repairs to the physical property, that is, to the land and building.  This interpretation, too, finds support in the text of the Agreement.  Section 6.2.1 spoke of "damage" and "repair" to the Property, words that, at least as commonly used, make little sense in the context of tenant leases.  In addition, Section 6.2.2, which discussed nonmaterial damage, provided that the reasonable cost to complete repairs was to be determined by "an architect or engineer," both of which are professionals with expertise in assessing the cost of repairs to physical property, not repairs to tenant leases.

Given that the text of the Agreement reasonably supports multiple, conflicting interpretations, the district court erred in concluding a reasonable estimate of costs to repair the "Property" unambiguously referred only to physical repairs.  On remand, the factfinder should consider extrinsic evidence to determine the parties' intent as to the meaning of the Agreement on this issue. See P.R. Laws Ann. tit. 31, § 3472 (in evaluating the parties'

-20-

intent, "attention must principally be paid to [the parties'] acts, contemporaneous and subsequent to the contract").[9]

## C. Tenant Estoppel Certificates

Wells next contends that the court erred in concluding that Chardón provided the required tenant estoppel certificates free of material discrepancies and, alternatively, that Wells waived that requirement. We need not reach the question of whether Chardón provided adequate estoppel certificates because even assuming it did not, we conclude that Wells has no remedy for this failure under the clear terms of the Agreement.

As a condition of Wells' obligation to close the transaction, the Agreement required that Chardón provide Wells with tenant estoppel certificates, free of material discrepancies, from certain AI Plaza tenants. However, Section 7.3.7(c) of the

---

[9] In its motion for summary judgment in the district court, Chardón pointed to certain extrinsic evidence that it contended "confirm[ed]" its interpretation of the "lucid" contractual language. However, Chardón has not argued, either in the district court or on appeal, that even if the contractual language were ambiguous, Chardón would be entitled to summary judgment based on the extrinsic evidence of intent. In any event, we cannot say that the extrinsic evidence of intent cited by Chardón was "so one-sided that no reasonable person could decide the contrary." See Boston Five, 768 F.2d at 8. In its motion for summary judgment, Chardón primarily pointed to correspondence between the parties in which Wells disputed the reasonableness of Chardón's estimates of repair costs and pointed out physical repairs that Chardón had failed to account for. This evidence certainly indicates that Wells believed that a reasonable estimate of repair costs under Section 6.2.1 included physical repairs, but does not necessarily establish that Wells intended a reasonable estimate of repair costs to be limited to physical repairs.

Agreement expressly stated that "[n]otwithstanding anything herein to the contrary . . . if Seller is unable to deliver the Required Estoppels" by the closing date, "then Purchaser's sole remedies and recourses shall be limited to either (A) waiving the requirement for the tenant estoppel certificate(s) in question and proceeding to Closing without reduction of the Purchase Price or (B) terminating this Agreement by immediate notification to Seller" and recovering its deposit. (Emphasis added.) Under the Agreement, notices such as that required by subsection (B) had to be in writing.

Wells strenuously argues that it did not waive the estoppel certificate requirement within the meaning of subsection (A) because in the weeks prior to closing, Wells repeatedly informed Chardón that some of the estoppels provided were inadequate under Section 7.3.7 and requested that new, compliant estoppels be delivered. At the same time, Wells concedes that it did not terminate the Agreement by written notice due to Chardón's alleged failure to provide the required estoppels free of material discrepancies, as permitted by subsection (B).

Faced with its failure to pursue either of the remedies set forth in Section 7.3.7, Wells contends that Section 7.3.7 "is silent about what happens if Wells does not elect either option" and argues that in this circumstance it should be deemed to have terminated the Agreement. But Section 7.3.7 is not silent about

-22-

Wells' remedies in the event that it declines to select either option -- instead, this section unambiguously states that Wells' "sole remedies and recourses" are "limited" to the two enumerated courses of action. We cannot, as Wells urges, ignore the Agreement's references to "sole" and "limited" remedies and rewrite the Agreement to provide a third avenue of relief. Because Wells chose not to pursue either of the options provided by Section 7.3.7(c), it has no remedy or recourse for Chardón's alleged failure to provide the required estoppels.[10]

**D. Maintenance Obligations**

Wells further contends that the court overlooked genuine issues of material fact in concluding that Chardón complied with its maintenance obligations under Section 6.1.3 of the Agreement.

Section 6.1.3 imposed an ongoing obligation on Chardón, from the effective date of the Agreement (January 25) through closing, to "maintain . . . all Improvements substantially in their

---

[10] Wells' argument that it should be deemed to have terminated the Agreement relies in part on the language of Section 10.2, a more general provision on the purchaser's remedies in the event that the seller defaults on its obligations under the Agreement for reasons other than the purchaser's failure to perform. However, even assuming that these two sections are in conflict, Section 7.3.7, which directly and specifically addresses the parties' remedies in the event that Chardón fails to deliver the required estoppels, cannot be set aside based on the general language of Section 10.2. See, e.g., Central Intern. Co. v. Kemper Nat. Ins. Cos., 202 F.3d 372 (1st Cir. 2000) (setting forth the "ordinary principle[] of contract interpretation" that "specific language is treated as a limitation on general language" (citing Restatement (Second) of Contracts § 203(c) (1979))).

present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with Seller's maintenance of the Improvements during Seller's period of ownership."[11]

Viewing the evidence in the light most favorable to the nonmoving party, Wells, we conclude that there are genuine issues of material fact as to whether Chardón maintained all "Improvements," in particular the building's back-up generators and associated fuel tanks and fuel-pumping system, substantially in their present condition and in a manner consistent with Chardón's maintenance during its ownership. On February 10, the transformer for AI Plaza's primary electrical service failed and the building's two back-up generators were activated. The back-up generators were powered by diesel fuel. A fuel-pumping system transported diesel fuel from large storage tanks in the building's basement to two smaller day tanks located on the top floor mechanical room. Late on February 11 or early on the morning of February 12, a control panel on the day tanks malfunctioned. As a result, the pumping system continued to pump fuel into the two day tanks even after they were full, causing them to overflow. Although the system sounded an alarm, it was only audible on one level of the building and was not heard for several hours. By the time the problem was

---

[11] The district court determined that "the 'as is' language contained in section 11.2 of the Agreement does not relieve [Chardón] of its specific maintenance obligations under Section 6.1.3." Chardón does not challenge that conclusion on appeal and therefore we do not address it.

-24-

discovered, about 1,200 gallons of fuel had spilled from the mechanical room into utility shafts, electrical ducts, and other parts of the building.

In granting summary judgment for Chardón, the district court relied on largely undisputed evidence of Chardón's preventive maintenance of the back-up generators. In June 2007, Chardón entered into an annual maintenance service contract with RIMCO, Inc., for the maintenance of the generators, pursuant to which RIMCO provided "Level II"[12] preventive maintenance on both generators twice annually. The last regular Level II maintenance visit before the fuel spill occurred in November 2007, and the next visit was scheduled for May 2008. On February 11, 2008, after the back-up generators were activated, RIMCO performed a "Level I" preventive inspection of the back-up generators at Chardón's request and found them to be in good operating condition. Shortly after the fuel spill, on February 14, RIMCO returned for another maintenance visit and found that a control panel on the day tanks was "frozen." The RIMCO technician reset the control panel, tested it, and found it operational. As a preventive measure, the technician then replaced the control panels at Chardón's request. The generators were again found to be in good operating condition. Based on this evidence, the court concluded that there was no

---

[12] RIMCO had two levels of maintenance service; Level II was the more comprehensive service.

genuine issue of fact as to whether Chardón complied with its maintenance obligations under Section 6.1.3.

However, additional evidence proffered by Wells, which was not mentioned by the district court, raised a genuine issue of material fact as to whether Chardón and/or its independent contractor, RIMCO, negligently maintained the building's back-up generators and associated fuel-pumping system in the days before the fuel spill. First, Wells produced evidence that the systems likely responsible for the spill, the fuel-pumping system and day tank control panels, were not within the scope of RIMCO's responsibility or expertise. RIMCO representatives testified that Chardón contracted with RIMCO to inspect and maintain only the generators themselves. RIMCO was not hired to perform, and did not have the technical expertise to perform, service and maintenance of the fuel-pumping system, the valves for the fuel-pumping system, the day tank control panels, or the alarm system. On February 11, the day before the fuel spill, the RIMCO technician did not inspect the day tank control panels or fuel-pumping system.[13] There is no evidence that anyone other than RIMCO was hired to inspect and maintain these associated systems.

_____

[13] Chardón disputes this view of the scope of RIMCO's maintenance responsibilities, pointing to evidence that the RIMCO Level II inspection checklist included "[c]hecking the function of all clocks and safety indicators" and that RIMCO did in fact inspect the generator gauges and security indicators. However, any factual dispute on this point is for the factfinder to decide.

Second, Wells produced evidence that Chardón's preventive maintenance of the generators between semiannual RIMCO inspections was not in accordance with the guidelines in the manufacturer's manual.  For example, although the manufacturer recommended weekly operational checks of the generators, Chardón's logbooks indicated that it ordinarily performed only monthly operational checks.

Third, Wells produced evidence that in February 2009, Chardón and its insurer filed suit against RIMCO and other independent contractors alleging negligence in the installation and maintenance of the electrical transformer, back-up generators, and associated systems.  The suit claimed, inter alia, that RIMCO was negligent in "not installing or appropriately maintaining, testing, inspecting, and/or repairing the diesel-driven backup generator systems, including the day tanks, in such a way as to ensure that the appropriate precautions were taken to avoid an overflow of diesel fuel from the day tanks."  Chardón does not dispute that its contractor's negligence may be imputed to it for purposes of this contractual obligation.  Such imputation would be consistent with certain tort law principles.  See Colmenares Vivas v. Sun Alliance Ins. Co., 807 F.2d 1102, 1107 (1st Cir. 1986) (stating "general principle" that the duty to keep business premises reasonably safe cannot be delegated to a third party (citing Restatement (Second) of Torts § 344 (1965))); see also Restatement (Second) of Torts § 425 (property owner who "employs an independent contractor to

-27-

maintain in safe condition land which he holds open to the entry of the public as his place of business" is liable for contractor's negligence).

Viewed in the light most favorable to Wells, the evidence permits a finding that Chardón did not fulfill its maintenance obligations under Section 6.1.3. A reasonable jury could find that Chardón and/or RIMCO negligently maintained the back-up generators, day tanks, and fuel-pumping system in the days leading up to the fuel spill, and that Chardón thereby failed in its ongoing obligation to maintain these "Improvements" substantially in their present condition and in a manner consistent with Chardón's maintenance during its ownership of the property.[14]

**E. Motion to Compel**

Finally, Wells contends that the district court abused its discretion in denying its motion to compel production of

---

[14] Chardón argues that "[w]hether or not RIMCO actually performed 'good' or 'bad' maintenance, or whether it maintained systems other than the generators, is totally irrelevant." In Chardón's view, it fulfilled its maintenance obligations under Section 6.1.3 simply because it "maintained the same level of maintenance" from the effective date of the Agreement through the purported closing date, that is, a Level II maintenance service contract with RIMCO. However, the requirements of Section 6.1.3 cannot be so easily avoided. If Chardón or its independent contractors negligently failed to maintain the back-up generators, day tanks, or fuel-pumping system in the weeks between the effective date of the contract and the closing date, a jury could reasonably find that Chardón failed to "maintain . . . all Improvements substantially in their present condition" within the meaning of Section 6.1.3.

documents related to Chardón's claim against its insurer for damages resulting from the fuel spill.

The trial court has "broad discretion in ruling on pre-trial management matters," and we review the court's denial of Wells' motion to compel "for abuse of its considerable discretion." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996). This standard of review is "not appellant-friendly," and we "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 860 (1st Cir. 2008) (quotation marks and citations omitted).

The district court denied Wells' motion to compel on the ground that its discovery request was "untimely and unduly burdensome," a determination well-supported by the record. On April 2, 2009, Wells for the first time demanded all documents related to Chardón's insurance claim for damages arising from the fuel spill, including "any documents submitted to your client's insurer and any correspondence among [the insurer] and [Chardón]." This broad request came months after the October 14, 2008 initial scheduling conference, the date by which the court had ordered the parties to serve all interrogatories and requests for production. Wells' original request for production of documents, which was filed in September 2008, within the discovery deadlines, did not

request any documents related to Chardón's insurance claim.[15]  In light of this evidence, the court acted within its considerable discretion in denying Wells' motion to compel.

## III.

For the foregoing reasons, the judgment of the district court is <u>affirmed</u> in part, <u>vacated</u> in part, and the case is <u>remanded</u> for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

<u>So ordered</u>.

---

[15] Wells contends that documents related to Chardón's insurance claim should have been produced in response to its original requests for production, which contained a request for "[a]ll documents concerning or relating to the Fuel Spill, and the subsequent clean-up and repairs associated therewith."  However, this general language cannot be reasonably understood as a request for documents related to Chardón's insurance claim.